## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RANDALL LEE BARNETT,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00047 |
| v. | ) | |
| | ) | **REPORT AND** |
| **KILOLO KIJAKAZI,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Randall Lee Barnett, ("Barnett"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Barnett protectively filed his applications for DIB and SSI on October 19, 2015, alleging disability as of December 1, 2014, based on sciatica; four bulging discs; chronic obstructive pulmonary disease, ("COPD"); hepatitis C; depression; and attention deficit hyperactivity disorder, ("ADHD"). (Record, ("R."), at 17, 266-67, 270-73, 287.) The claims were denied initially and upon reconsideration. (R. at 125-27, 131-33, 136-38, 142-44, 14751, 153-58, 160-62.) Barnett then requested a hearing before an administrative law judge, ("ALJ"). (R. at 163-64.) The ALJ held a hearing on April 27, 2018, at which Barnett was represented by counsel. (R. at 37-71.)

The ALJ issued an unfavorable decision on August 24, 2018. (R. at 17-30.) The ALJ found that Barnett met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 19.) The ALJ found Barnett engaged in substantial gainful activity from January through March of 2017. (R. at 19.) However, the ALJ further found there was a continuous 12-month period during which Barnett did not engage in substantial gainful activity, noting that the remaining findings in his decision addressed such period. (R. at 19.) The ALJ found Barnett had severe impairments, namely lumbago with sciatica; left elbow bursitis and left shoulder impairment; asthma; chemical burns in March 2017 with reactive

airway dysfunction syndrome and headaches; anxiety; and ADHD, but he found Barnett did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-23.) The ALJ found Barnett had the residual functional capacity to perform light[2] work requiring no more than occasional pushing/pulling with the left arm; no more than occasional exposure to temperature extremes, excessive noise, vibrations and pulmonary irritants; no exposure to hazards or unprotected heights; and no strict production rates or pace requirements. (R. at 23.) The ALJ found Barnett was unable to perform any of his past relevant work. (R. at 28.) However, based on Barnett's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found Barnett could perform other jobs existing in significant numbers in the national economy, including those of a tanning salon attendant, a furniture rental consultant and a retail marker. (R. at 29.) Thus, the ALJ concluded Barnett was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits from December 1, 2014, through the date of the decision. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Barnett pursued his administrative appeals, (R. at 247-49), but the Appeals Council denied his request for review. (R. at 1-5.) Barnett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Barnett's motion for summary

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

judgment filed May 28, 2021, and the Commissioner's motion for summary
judgment filed July 28, 2021.

## II. Facts

Barnett was born in 1969, (R. at 266, 270), which, on the alleged onset date
and at the time of the ALJ's decision, classified him as a "younger person" under 20
C.F.R. §§ 404.1563(c), 416.963(c). Barnett has an eleventh-grade education and past
work as a railroad car loader, a painter, a mechanic repairer and a painting
supervisor. (R. at 47, 65-66.) He testified he had a work accident in March 2017,
while cleaning a "cure room" at Lexington Railcar, during which he suffered a
chemical burn, resulting in breathing issues. (R. at 45-47.) Prior to that, Barnett
worked at Samuel Pressure Vessel Group, but was laid off when his back prevented
him from picking up the paint. (R. at 52-53.) Barnett testified he took multiple
medications for his breathing issues, and he had a nebulizer, which he did not use
much. (R. at 53-54.) When asked, he denied being released to return to work from a
pulmonary standpoint. (R. at 54-55.) Barnett testified he "guess[ed]" he had a history
of ADHD, but for which he no longer took Adderall because he was "kinda
comatosed" from taking five different narcotics. (R. at 55, 57.) He stated he was
placed on Suboxone "when [he] quit … all that medicine." (R. at 56.) Barnett
testified his anxiety and ADHD caused focus and concentration issues. (R. at 55.)
He testified his breathing difficulties were the most severe condition preventing him
from working, noting that trying to do anything made it difficult for him to breathe.
(R. at 57.) He also testified he had bursitis in both shoulders, which he just had to
"deal with." (R. at 61.) Barnett stated he could reach up with his left arm over his
head as long as he kept it flexible. (R. at 61.) He stated he experienced severe, daily
headaches ever since the work accident, and although his doctor wanted him to see

a specialist in North Carolina, that was too far to go. (R. at 61-62.) Barnett said these headaches required him to lie down at least two or three times daily. (R. at 62.)

Barnett testified he had low back pain, radiating into his right leg and causing bilateral leg numbness, making it difficult to walk. (R. at 58.) However, because he lacked insurance, he was not receiving any treatment for this issue. (R. at 58-59.) Barnett estimated he could sit for 15 to 20 minutes at a time; stand about 10 minutes in one place; walk about five to 10 minutes before becoming short of breath; and lift five to 10 pounds. (R. at 59.) He stated he mostly stayed home, other than going to medical appointments. (R. at 62.) Barnett stated he tried to walk around the house to keep moving. (R. at 62.) He said he could fix his own meals by using a stool to sit on while he cooked, and he was able to do laundry. (R. at 63.) Barnett also stated his daughter helped with household chores, and she did the grocery shopping. (R. at 63.) He said he did not have a driver's license due to unpaid fines. (R. at 55-56.)

Rick Bradley, a vocational expert, also was present and testified at Barnett's hearing. (R. at 64-69.) Bradley testified a hypothetical individual of Barnett's age, education and work history, who had the residual functional capacity to perform light work that required no more than occasional pushing/pulling or use or levers with the left arm; no more than occasional exposure to extreme temperatures or pulmonary irritants, such as fumes, odors, dust, gases and poorly ventilated areas; no exposure to hazards, such as machinery and unprotected heights; and no work involving strict production rates or pace requirements, could not perform any of Barnett's past work. (R. at 66-67.) However, he testified this individual could perform other jobs existing in significant numbers in the national economy, including those of a tanning salon attendant, a furniture rental consultant and a retail marker. (R. at 67.) Bradley next testified that the same hypothetical individual, but

who was limited to standing and walking for a total of four hours and sitting for four hours in an eight-hour workday, could perform the same jobs because they would allow for a sit/stand option. (R. at 68.) He testified if an individual would be off task more than 10 percent of the workday or would be absent two or more days monthly, there would not be any jobs. (R. at 68-69.)

In rendering his decision, the ALJ reviewed medical records from Dr. Nicolas Tulou, M.D., a state agency physician; Stonsa Insinna, Ph.D., a state agency psychologist; Jo McClain, Psy.D., a state agency psychologist; Dr. Luc Vinh, M.D., a state agency physician; Norton Community Hospital, ("Norton Community"); Dr. George O. Halstead, M.D.; Renaissance Surgery Center; Jonesville Family Health Center; The Allergy, Asthma & Sinus Center; Associated Orthopedics of Kingsport; Ear, Nose and Throat Associates; Mountain States Medical Group; Associated Neurologists; and Indian Path Medical Center, ("Indian Path").

The record shows that Barnett treated with Dr. George O. Halstead, M.D., a pain management specialist, since 2013. (R. at 367.) On December 5, 2013, Barnett reported low back pain, which he rated as an eight on a 10-point scale. (R. at 367.) Barnett's diagnoses were listed as chronic pain syndrome, ADHD and gastroesophageal reflux disease, ("GERD"), for which Dr. Halstead prescribed Subutex, Adderall and Prevacid. (R. at 367.) By October 30, 2014, he rated his pain as a six to seven, but described it as stable, tolerable and controlled. (R. at 388.) Barnett complained of tingling in his legs. (R. at 388.) On examination, Barnett had stable vital signs; his lungs were clear, bilaterally; he had normal cardiac findings; he was fully oriented; and he had a bright affect. (R. at 388.) Dr. Halstead diagnosed Barnett with chronic pain and ADHD, and he added Neurontin, Klonopin and Fioricet to his medications. (R. at 388.) Barnett continued to treat with Dr. Halstead

every two to four weeks through January 2016. On March 9, 2015, Dr. Halstead prescribed Celexa. (R. at 382.) On April 20, 2015, Barnett reported a possible torn left rotator cuff.[3] (R. at 380.) Nonetheless, on April 30, 2015, Barnett advised Dr. Halstead he was going to the beach for two weeks. (R. at 379.) He stated his rotator cuff damage was pending surgery. (R. at 379.) On July 29, 2015, Barnett reported increased anxiety, a weak stream and difficulty emptying his bladder. (R. at 374.) Dr. Halstead added Flexeril to Barnett's medications. (R. at 374.) On August 26, 2015, Barnett reported sciatica, nerve damage and degenerative disc disease, and he stated he was applying for disability. (R. at 372.) On October 7, 2015, Barnett stated he was working on getting ADHD documentation. (R. at 371.) On November 17, December 2, December 16 and December 30, 2015, as well as January 13, 2016, Barnett described his anxiety as stable. (R. at 479-83.) On January 27, 2016, Dr. Halstead noted he received a phone call from an individual, stating Barnett and his girlfriend were selling their medications. (R. at 478.) Over this time, Barnett rated his pain between a five and seven, but consistently between a five and six. Nonetheless, he also consistently described it as stable, tolerable and controlled. Dr. Halstead's examination findings and his diagnoses remained unchanged, and he continued Barnett on medications.

Dr. Halstead completed a physical assessment of Barnett on February 11, 2016, indicating he had treated Barnett every two to four weeks since November 7, 2013, for degenerative disc disease, sciatica, depression and chronic pain. (R. at 525-27.) Dr. Halstead listed Barnett's symptoms as chronic lumbago, sciatica and

___

[3] An April 18, 2015, treatment note from Norton Community, reveals Barnett presented with complaints of left shoulder pain. (R. at 343.) Although x-rays showed no abnormality, he was diagnosed with a left rotator cuff injury and advised to follow up with an orthopedist in three to four days. (R. at 344, 346-47.) There is no such orthopedic treatment note in the record.

fatigue. (R. at 525.) He characterized Barnett's pain as continuous, moderate to severe low back pain, radiating down the legs and precipitated by movement and exertion. (R. at 525.) For the clinical findings and objective signs of Barnett's pain, Dr. Halstead indicated he guarded his back and had a slight limp. (R. at 525.) He noted Barnett's impairments had lasted or could be expected to last at least 12 months. (R. at 525.) Dr. Halstead indicated Barnett was not a malingerer. (R. at 525.) He opined Barnett could stand/walk a total of four hours and sit a total of four hours in an eight-hour workday. (R. at 526.) He further opined Barnett would need a job allowing shifting from sitting, standing or walking at will. (R. at 526.) Dr. Halstead opined Barnett could frequently lift/carry items weighing less than 10 pounds, occasionally lift/carry items weighing 10 pounds, rarely lift/carry items weighing 20 pounds and never lift/carry items weighing 50 pounds. (R. at 526.) He opined Barnett could occasionally twist, stoop, crouch/squat and climb stairs, but rarely climb ladders. (R. at 526.) Dr. Halstead opined Barnett had no significant limitations with reaching, handling or fingering. (R. at 526.) He opined Barnett's impairments were reasonably consistent with the symptoms and functional limitations described in the assessment. (R. at 527.) Dr. Halstead also opined Barnett's pain or other symptoms were severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks. (R. at 527.) Given Barnett's moderate anxiety and depression, Dr. Halstead opined Barnett could perform low-stress jobs. (R. at 527.) He opined Barnett would be absent from work more than four days monthly due to his impairments or treatment. (R. at 527.) Dr. Halstead deemed Barnett's prognosis poor. (R. at 525.)

On February 18, 2016, Stonsa Insinna, Ph.D., a state agency psychologist, noted on a Psychiatric Review Technique form, ("PRTF"), completed in connection with the initial consideration of Barnett's claims, that there was insufficient evidence

to make a determination, given his failure to cooperate in the processing thereof. (R. at 82.) Also on this date, Dr. Nicolas Tulou, M.D., a state agency physician, stated there was insufficient vocational information to determine whether Barnett could perform any of his past relevant work. (R. at 83.) Nonetheless, based on the evidence in the file, Dr. Tulou concluded he could adjust to other work. (R. at 83.)

Barnett established care with Sarah Janie Evans, N.P.-C., a certified nurse practitioner at Jonesville Family Health Center, on April 5, 2016. (R. at 563.) At that time, he stated he saw Dr. Halstead for back and neck pain, but it was becoming more difficult to afford treatment with a pain management specialist. (R. at 563.) When Barnett requested medication refills, Evans advised him she did not prescribe Subutex. (R. at 563.) He said his pain was annoying and interfered with his activities of daily living. (R. at 563.) He rated his pain as a six to eight and worse with activity, sleeping and weather changes. (R. at 563.) Barnett described his pain as constant, but more intense at times. (R. at 563.) He reported smoking a pack of cigarettes daily and using smokeless tobacco. (R. at 564.) Barnett endorsed headaches, sleep disturbance, shortness of breath on exertion and lying down, swelling of the hands and feet, occasional palpitations, smokers cough, sleep apnea, low back pain, bilateral sciatica, joint pain and stiffness, limitation of joint movement, muscle pain and weakness and numbness and tingling in both legs. (R. at 564.) He denied any symptoms of neck pain. (R. at 564.) Barnett also endorsed depression, decreased energy, lack of interest, difficulty focusing and anxiety. (R. at 564.)

On examination, Barnett's lungs were clear, and breathing was normal; heart rate was normal with regular rhythm; there was no edema, cyanosis or clubbing; gait was slow; there was tenderness to palpation of the cervical spine and paraspinal muscles, but normal range of motion and stability; there was tenderness to palpation

across the lower back, but normal lumbar lordosis, range of motion and stability of the lumbar spine; the left upper extremity had normal range of motion and no joint instability, but there was elbow swelling; muscle tone, bulk and strength were normal; and there was diminished sensation in the right upper extremity and both lower extremities. (R. at 565.) Barnett had appropriate judgment, good insight, proper orientation, a flat mood and appropriate affect. (R. at 565.) Evans diagnosed GERD without esophagitis; unspecified ADHD; left elbow olecranon bursitis; and low back pain. (R. at 565.) She encouraged Barnett to follow up with his pain management specialist for Subutex treatment, referred him to behavioral health for further evaluation and treatment of ADHD, and she refilled his Neurontin, Klonopin and Adderall "for now." (R. at 565.) A steroid injection was administered in Barnett's left elbow, and he was advised to use ice compresses and naproxen. (R. at 565-66.)

When Barnett returned to Evans on April 19, 2016, he reported no change in his elbow. (R. at 557.) He again stated it was annoying and interfered with his activities of daily living, noting it was most pronounced with activity. (R. at 557.) On examination, there was swelling of the left upper extremity, and it was soft with palpation as if fluid filled, but there was normal range of motion and no joint instability. (R. at 559.) Barnett had appropriate judgment, good insight, proper orientation, a euthymic mood and an appropriate affect. (R. at 559.) Evans continued to diagnose left elbow olecranon bursitis, she ordered x-rays and prescribed naproxen. (R. at 559-60.) On May 3, 2016, Barnett underwent an L5-S1 interlaminal epidural steroid injection by Dr. William M. Platt, M.D., a neurosurgeon, for lumbar spondylosis. (R. at 536.) On May 31, 2016, Barnett reported he had been discharged from The Laurels inpatient substance detoxification five days previously. (R. at 544.) He stated, at that time, he was taking Suboxone only and was enrolled in a six-week

program to come off it completely. (R. at 544.) Barnett also reported he had stopped smoking, but continued using smokeless tobacco. (R. at 544.) His only complaint was left elbow pain, and he denied depression and anxiety. (R. at 545.) On examination, there was slight swelling of the left upper extremity, which was tender to palpation, but with normal range of motion and no joint instability. (R. at 546.) Barnett had appropriate judgment, good insight, proper orientation, a euthymic mood and an appropriate affect. (R. at 546.) The remainder of the examination was normal. (R. at 546.) Evans continued to diagnose left elbow olecranon bursitis, for which she recommended icing and naproxen. (R. at 546.)

On August 18, 2016, Dr. Luc Vinh, M.D., a state agency physician, completed a physical residual functional capacity assessment of Barnett, finding he could perform light work, except he could stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently push/pull with the left upper extremity; frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes and scaffolds. (R. at 94-95.) Dr. Vinh imposed no manipulative, visual, communicative or environmental limitations. (R. at 95.) In support of these limitations, Dr. Vinh noted findings of a tender cervical spine, a slowed gait and left elbow bursitis and tenderness. (R. at 95.)

Jo McClain, Psy.D., a state agency psychologist, completed a PRTF of Barnett on August 22, 2016, finding he had no restrictions on his activities of daily living; no difficulties maintaining social functioning or maintaining concentration, persistence or pace; and had experienced no episodes of decompensation of extended duration. (R. at 92-93.) McClain opined Barnett could follow simple written instructions, and his medically determinable mental impairments were nonsevere for disability purposes. (R. at 93.)

Barnett was hospitalized at Indian Path from March 28, 2017, to April 7, 2017, after suffering a chemical exposure and burns to his face, neck, chest, forearms, abdomen and knees while working. (R. at 679-80.) A week prior to his admission, Barnett was cleaning a rail car to prepare it for painting when he came in contact with lime and alcohol. (R. at 679.) He developed a rash, and his condition worsened over the next couple of days, prompting him to seek treatment at a clinic, where he received a course of steroids. (R. at 679.) Barnett improved a little over the next couple of days, but once he completed the steroids, his condition acutely worsened, including lip, eye and, possibly, throat swelling, prompting him to seek emergent treatment. (R. at 679-80.) Over the course of his hospitalization, Barnett developed painful swelling of his mouth and a productive cough with shortness of breath and wheezing. (R. at 680.) He was treated with intravenous steroids, Benadryl and famotidine. (R. at 680.) Barnett also received bronchodilator therapy and supplemental oxygen. (R. at 680.) Pulmonology performed a bronchoscopy, which showed mucositis and sinusitis, for which antibiotics and oral steroids were recommended. (R. at 680, 695.) Chest x-rays, dated April 2 and 3, 2017, showed no acute cardiopulmonary abnormality or disease. (R. at 713-14.) An April 4, 2017, chest CT showed minimal ground glass density, which might reflect minimal pneumonitis; and a very small amount of bibasilar atelectasis. (R. at 717.) A CT of the soft tissue of Barnett's neck showed mucosal thickening at the floor of the maxillary sinus; and a patent airway and clear lung apices. (R. at 715.) During his admission, it was discovered that Barnett had elevated blood pressure with occasional accelerated hypertension, as well as an A1C level consistent with mild diabetes, and he was placed on medications with good results. (R. at 680, 699.) At discharge, Barnett was improving, overall, with improved chemical burn and improved cough. (R. at 680.) Physical examination at that time revealed coarse breath sounds, rhonchi in the upper lobes that cleared with cough and few expiratory

wheezes; diffuse erythema of the skin on the neck, face and torso, faintly visible, but no angioedema; and no focal neurologic findings. (R. at 680.) Barnett was pleasant and cooperative with normal judgment and insight. (R. at 680.) Discharge diagnoses included improving chemical burns to the face, neck, chest, forearms, abdomen and knees; resolved angioedema; chemical pneumonitis; accelerated hypertension, improving with medications; hyperglycemia with new onset diabetes type II; and mucositis and sinusitis by bronchoscopy. (R. at 679.) Barnett was instructed to follow up with his primary care provider and pulmonology. (R. at 680.)

When Barnett saw Dr. Richard A. McNeilly, D.O., a pulmonologist with MSMG – Cardiology Kingsport, on April 17, 2017, he reported continued burning in the chest with deep breathing, coughing up sputum and intermittent wheezing. (R. at 627.) While he complained of shortness of breath on exertion, orthopnea and nocturnal awakenings, he said these were improving. (R. at 627.) Barnett reported some continued fatigue, chills, night sweats, chest pain, palpitations, leg edema, confusion, dizziness, headaches and muscle weakness, but he denied anxiety and depression. (R. at 627-28.) He stated he had not returned to work. (R. at 627.) Barnett was alert and fully oriented; skin erythema was improving; lungs were clear, bilaterally, without rales or rhonchi, and there was no dullness to percussion; extremity pulses were 2+/4, with no clubbing, cyanosis or edema; there were no focal deficits; and insight and judgment were intact. (R. at 629.) Dr. McNeilly diagnosed occupational exposure; mucositis; tracheitis; chemical burn of the chest wall; irritant contact dermatitis due to other chemical products; ground glass opacity on lung imaging; Streptococcus pneumoniae infection; and Haemophilus influenzae infection. (R. at 629-30.) He ordered pulmonary function testing. (R. at 630.) Dr. McNeilly released Barnett to return to work from a pulmonary standpoint with a respirator or some type of protective gear to prevent further exposure or irritation.

(R. at 630.) Pulmonary function testing, performed on May 3, 2017, showed no obstruction, with an $FEV_1$[4] of 4.21 L at 105% of predicted; there was no significant response to bronchodilators; there was no restriction with a total lung capacity of 6.95 L at 89% of predicted; and diffusion was increased at 136% of predicted with a DLCO/VA[5] of 111% of predicted. (R. at 640-41, 678.)

When Barnett saw Dr. Phillip W. Jones, M.D., at The Allergy, Asthma & Sinus Center on May 30, 2017, he had "markedly improved." (R. at 571.) Barnett denied headaches associated with his nasal and sinus symptoms, wheezing, shortness of breath and/or chest tightness, joint pain, joint swelling, muscle pain, weakness, backache and mood disturbance. (R. at 571-72.) On examination, he was alert and in no acute distress; appropriately responsive and able to complete full sentences without interruption; he had a severe left septal deviation; lungs were clear to auscultation, bilaterally, and there were good excursions, no egophony,[6] wheezing, rales or rhonchi; motor and sensory exam was grossly normal; and there was no cyanosis, clubbing or edema of the extremities. (R. at 573.) Dr. Jones diagnosed chemical pneumonitis and chemical burn, and he stated he was "very hesitant" to release Barnett to his prior work environment at that time. (R. at 573.)

---

[4] $FEV_1$ refers to forced expiratory volume in one second, or the total volume of air a patient can exhale in the first second during maximal effort. *See* aafp.org/afp/2014/0301/p359.html (last visited Mar. 2, 2022).

[5] DLCO refers to the diffusing capacity of the lung for carbon monoxide. VA refers to vital capacity, or the largest volume measured on complete exhalation after full inspiration. *See* aafp.org/afp/2014/0301/p359.html (last visited Mar. 2, 2022).

[6] Egophony is a modification of the voice, resembling bleating, heard on auscultation of the chest, present in some diseases such as pleurisy with effusion. *See* merriam-webster.com/medical/egophony (last visited Mar. 2, 2022).

Barnett returned to Dr. McNeilly on June 13, 2017, with complaints of feeling like something was stuck in his chest/throat and constantly coughing up sputum. (R. at 622.) He reported wheezing and hoarseness, dyspnea on exertion after exercising and with stairs and headaches and feeling like his eyes were bulging, associated with his sinuses. (R. at 622.) He denied arthralgias, back pain, joint pain, joint swelling and joint stiffness, as well as depression and anxiety. (R. at 622-23.) Barnett described his breathing as "so-so." (R. at 622.) Physical examination was normal, Dr. McNeilly added sinus headache to Barnett's diagnoses, and he ordered repeat pulmonary function testing since Barnett had completed steroids. (R. at 624-25.) He also referred Barnett to an ENT for his sinus headaches. (R. at 625.) Dr. McNeilly noted that Barnett was trying to stop smoking with the use of nicotine patches. (R. at 625.) Again, he noted that, from a pulmonary standpoint, Barnett was "okay to return to work," but he recommended Barnett wear a respirator or some other form of protection when around irritants. (R. at 625.) He also recommended Barnett continue to follow up with an allergist. (R. at 625.) Dr. McNeilly performed additional pulmonary function testing on June 30, 2017, finding a moderate obstruction with an $FEV_1$ of 2.18 L at 54% of predicted; no significant response to bronchodilators; no restriction with a total lung capacity of 7.76 L at 100% of predicted; there was air trapping with a residual volume of 138% of predicted and suggestion of hyperinflation with increased residual volume to total lung capacity ratio; and diffusion was normal at 99% of predicted with a DLCO/VA of 113% of predicted. (R. at 637, 677.) Dr. McNeilly noted this testing "may be consistent with emphysema." (R. at 677.) A chest CT showed resolution of the ground glass opacities/pneumonitis. (R. at 643.)

On July 10, 2017, Barnett reported developing more thickened sputum leading to significant coughing fits, as well as nausea, vomiting, coughing up blood,

shortness of breath and significant sinus issues, but he denied arthralgias and sleep disturbance. (R. at 617-18.) On examination, Barnett was alert and fully oriented; he had a cough, but the lungs were clear to auscultation and without wheezing, rales or rhonchi; pulses in the extremities were 2+/4, and there was no clubbing, cyanosis or edema. (R. at 620.) Dr. McNeilly diagnosed occupational exposure to lime and alcohols in the workplace; history of ground glass opacity on lung imaging; likely irritant induced asthma versus reactive airways dysfunction syndrome; and chewing tobacco use. (R. at 620.) He prescribed Symbicort and Albuterol inhalers. (R. at 620.)

Barnett saw Dr. Jonathan Winstead, M.D., an ENT at Ear, Nose and Throat Associates, on July 13, 2017, on Dr. McNeilly's referral, with complaints of severe sinus headaches since the March 2017 chemical exposure. (R. at 596.) He also reported ringing in both ears with some severe pain and drainage from the left ear. (R. at 596.) On examination, Barnett was well-groomed, in no acute distress and had a normal ability to communicate; he had a normal ear exam, bilaterally; he had a deviated left septum; he exhibited normal respiratory effort and normal breath sounds; he had no peripheral vascular swelling; he was fully oriented with a normal and appropriate mood and affect; and cranial nerves were intact and symmetrical. (R. at 597.) Dr. Winstead diagnosed acute sinusitis; deviated left nasal septum; and headaches, and he prescribed antibiotics and oral steroids. (R. at 597-98.) He also instructed Barnett to use over-the-counter nasal saline spray. (R. at 598.) When Barnett returned on August 21, 2017, he reported the medications helped his symptoms while taking them, but the symptoms returned two days after completing them. (R. at 593.) He complained of having a headache, eye pressure and constant runny nose that day. (R. at 593.) An examination again showed the deviated left septum. (R. at 594.) A maxillofacial CT performed this day showed severe septal deviation on the left and right inferior turbinate hypertrophy, but no acute sinus

-16-

disease. (R. at 594, 599.) Dr. Winstead diagnosed Barnett with acute sinusitis, resolved; left deviated nasal septum; headache; hypertrophy of the right nasal turbinates and postnasal drip. (R. at 594.) He prescribed Atrovent nasal spray for drainage and instructed Barnett to use Allegra or Claritin daily. (R. at 594.) Dr. Winstead noted Barnett had a pre-existing nasal fracture that was contributing to his nasal obstruction and might be contributing to his drainage. (R. at 594.) He referred Barnett to a neurologist to evaluate whether the headaches were related to his chemical exposure. (R. at 594.) Dr. Winstead advised Barnett that a surgical repair of the septal deviation would improve his nasal breathing if he wished to pursue this in the future. (R. at 594-95.)

On September 7, 2017, Barnett advised Dr. McNeilly he was doing well with Symbicort, but continued to complain of dyspnea on exertion, occasional shortness of breath at rest, nocturnal awakenings and wheezing. (R. at 612.) He reported his breathing was about the same. (R. at 612.) Barnett denied arthralgias, back pain, joint pain, joint swelling, joint stiffness, anxiety and depression. (R. at 613.) On examination, he was alert, fully oriented and in no acute distress; his heart was of regular rate and rhythm with no murmur, gallops or rubs; lungs were clear, bilaterally, without wheezing, rales or rhonchi and with good inspiratory effort; extremity pulses were 2+/4 and without cyanosis, clubbing or edema; no focal deficits were noted; insight and judgment were intact; and there was no somatic dysfunction. (R. at 615.) Dr. McNeilly continued to diagnose reactive airway dysfunction syndrome; occupational exposure in the workplace; chewing tobacco use; and history of ground glass opacity on lung imaging, he continued Barnett on inhalers, and he ordered repeat pulmonary function testing. (R. at 615-16.) Dr. McNeilly again stated Barnett may resume work with a respirator and avoidance of irritants. (R. at 616.) Pulmonary function testing on October 19, 2017, revealed the

pre-bronchodilator spirometry was a poor study and poor effort; the post-bronchodilator spirometry had no obstruction with an $FEV_1$ of 2.47 L at 62% of predicted; there was no significant response to bronchodilators; and the FVC[7] was decreased to 59% of predicted on the post-bronchodilator spirometry, suggesting restrictive lung disease, as well. (R. at 635-36, 676.)

On December 13, 2017, Barnett continued to complain of cough and occasional wheezing, nocturnal awakenings several times weekly due to wheezing, requiring Albuterol use, and sputum production. (R. at 607.) He stated his breathing was worse, overall, in cold air, and he felt "raw" in his chest. (R. at 607.) Barnett also endorsed fatigue, dyspnea on exertion, nasal drip, sore throat and hoarseness, but he denied arthralgias, back pain, joint pain, joint swelling, joint stiffness, anxiety and depression. (R. at 607-08.) On examination, he was alert, fully oriented and in no acute distress; heart rate and rhythm were regular, without murmur, gallop or rub; extremity pulses were 2+/4 and without edema; no focal deficits were noted; and insight and judgment were intact. (R. at 610.) Dr. McNeilly noted decreased spirometry readings on Barnett's most recent testing, and he added Spiriva and Singulair to his medication regimen. (R. at 610.)

On December 20, 2017, Barnett saw Dr. Christopher A. Pendola, M.D., a neurologist, for complaints of constant headaches. (R. at 586.) Barnett reported Motrin, Aleve and Excedrin provided no relief, but lying down tended to ease his headaches. (R. at 586.) He endorsed eye pain and burning, but he denied depression, anxiety, hallucinations and memory loss. (R. at 585.) On examination, Barnett was

---

[7] FVC refers to forced vital capacity, or the total volume of air a patient is able to exhale for the total duration of the test during maximal effort. *See* aafp.org/afp/2014/0301/p359.html (last visited Mar. 2, 2022).

well-dressed and groomed; alert; attentive; appropriate; fully oriented; in no apparent distress; he had clear sensorium; normal general fund of knowledge; intact recent and remote memory, as well as reading and repetition; normal judgment; fluent and clear speech, without any evidence of an aphasia; no apraxia; and normal mood and affect. (R. at 585.) He had normal muscle strength, bulk and tone in all extremities; intact sensation in all extremities; normal reflexes; normal gait and tandem walk; he could walk on toes and heels normally; there was no postural instability; he had full range of neck motion; lungs were clear to auscultation, bilaterally; and there was no clubbing, cyanosis or edema of the extremities. (R. at 583-85.) Dr. Pendola diagnosed chronic daily headaches following a chemical burn, as well as blurred vision, he ordered an MRI and an MRA,[8] and he initiated a trial of topiramate. (R. at 583.) Dr. Pendola further recommended referral to an ophthalmologist. (R. at 583.) On January 4, 2018, an MRA of Barnett's brain was normal; an MRI of the brain from this same date showed mild small vessel ischemic change and mild mucosal thickening of the right nasal cavity and right ethmoidal air cells, but no intracranial abnormality. (R. at 581-82.)

When Barnett returned to Dr. Pendola on February 20, 2018, he was doing "about the same." (R. at 579.) Dr. Pendola noted Barnett had undergone an eye examination, revealing no evidence of any ocular damage causing his headaches. (R. at 579.) On examination, Barnett was alert, attentive, appropriate and in good spirits, with clear and fluent speech; he had no aphasia; he was in no distress; motor strength was normal in all extremities; gait and station were normal; sensation was normal; and there was no clubbing or cyanosis of the extremities. (R. at 579-80.) Dr. Pendola

---

[8] MRA, or magnetic resonance angiogram, is a type of MRI that looks specifically at the body's blood vessels. *See* www.hopkinsmedicine.org/health/treatment-tests-and-therapies/magnetic-resonance-angiography-mra (last visited Mar. 2, 2022).

recommended a referral to a headache clinic in North Carolina and that Barnett follow up closely with a primary care physician to ensure he kept his blood pressure, lipids and glucose optimally controlled, given the small vessel ischemic disease. (R. at 578.)

When Barnett returned to Dr. Winstead on March 2, 2018, for a recheck of recurring sinusitis, he stated nasal spray seemed to be helping, but he reported continued sinus drainage. (R. at 590.) His examination remained the same. (R. at 591.) Dr. Winstead added leukoplakia of the oral mucosa, including the tongue, to Barnett's diagnoses, and he advised him to use over-the-counter nasal gel. (R. at 591.) He stated Barnett had no obvious signs of chronic sinusitis, and his rhinorrhea improved with Atrovent. (R. at 591.) Dr. Winstead also stated Barnett's nasal obstruction was due to a severe septal deviation that had been present for many years, and he had a headache behind the right eye, for which he purportedly had seen neurology and ophthalmology. (R. at 591.) Barnett's diagnoses remained unchanged. (R. at 591.)

Barnett returned to Dr. McNeilly on March 21, 2018, complaining of increased wheezing with increased coughing, mostly in the morning and evening. (R. at 602.) Otherwise, he reported his breathing was stable with medications. (R. at 602.) Barnett reported dyspnea at rest and on exertion, awakening with shortness of breath, joint swelling and headaches, but he denied arthralgias, joint pain, joint stiffness, back pain, anxiety and depression. (R. at 602-03.) He stated he was unable to return to work because he could not wear a respirator. (R. at 602.) On examination, he was alert and fully oriented; he exhibited bilateral, end-expiratory wheezing; extremity pulses were 2+/4; and he had no cyanosis, clubbing or edema. (R. at 605.) Dr. McNeilly added asthma exacerbation to Barnett's diagnoses, and he prescribed

steroids and ordered a chest x-ray. (R. at 605-06.) This x-ray showed no acute heart or lung disease. (R. at 674.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining

whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Barnett argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinion of his treating physician, Dr. Halstead. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-12.) Barnett also argues the ALJ erred by improperly considering his symptoms. (Plaintiff's Brief at 12-15.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) (2020); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545, 416.945 (2020).

The ALJ found Barnett had the residual functional capacity to perform light

work, except he could occasionally push/pull with the left arm; have occasional exposure to temperature extremes, excessive noise, vibrations and pulmonary irritants; have no exposure to hazards or unprotected heights; and perform no work requiring strict production rate or pace requirements. (R. at 23.)

In making this residual functional capacity finding, the ALJ gave "little weight" to Dr. Halstead's opinion and "some weight" to Dr. Vinh's opinion. (R. at 27-28.) Barnett argues that Dr. Halstead's opinion is entitled to great deference because he is a treating source, and the ALJ must provide "good reasons" for the weight given to his opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2020) ("We will always give good reasons in our … decision for the weight we give your treating source's medical opinion."). While the ALJ, under the version of the regulations in place at the time of Barnett's filing, was required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ was not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (2020). In fact, even an opinion from a treating physician will be accorded significantly less weight it if is "not supported by clinical evidence or if it is inconsistent with other substantial evidence. …" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (2020).

In his decision, the ALJ stated he was giving Dr. Halstead's opinion "little weight" because it was inconsistent with the record, which did not support such harsh limitations. (R. at 27.) Specifically, the ALJ found Barnett's treatment records and his work history did not suggest he would be absent from work more than four

days monthly or that he would be limited to lifting/carrying 10 pounds. (R. at 27.) The ALJ correctly stated Barnett returned to work in 2017, during the time which he claimed to be totally disabled, cleaning and painting railroad cars. (R. at 27, 45-46, 679, 683, 688.) As the Commissioner states in her brief, the ALJ was allowed to consider Barnett's work activity during the relevant time period. *See* 20 C.F.R. §§ 404.1571, 416.971 (2020) ("The work … that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level.") Moreover, "[e]ven if the work [a claimant] ha[s] done was not substantial gainful activity, it may show that [he is] able to do more work than [he] actually did." 20 C.F.R. §§ 404.1571, 416.971. Here, although Barnett returned to work for only a couple of months, the record demonstrates he stopped working in March 2017 due to acute injuries resulting from a chemical burn, not as a result of any pre-existing impairments. Moreover, Barnett's own limited description of his work activities during the course of his hospitalization for the chemical burns reveals he was cleaning and painting rail cars, including crawling underneath rail cars and lying on the ground. (R. at 679, 683, 688.)

Further, as stated by the ALJ, Barnett's treatment records do not support Dr. Halstead's opinion, as he underwent mostly conservative treatment, and his physicians indicated his pain was stable and controlled with medications. (R. at 27.) For instance, Barnett's back, shoulder and elbow pain were treated with medications. In April 2016, he received a steroid shot in his left elbow, and in May 2016, he received an epidural steroid injection in his low back. Later that month, Barnett did not complain of back pain. Although he continued to complain of left elbow pain, only icing and naproxen were recommended. Dr. Halstead routinely prescribed medications, which, as the ALJ stated, made Barnett's pain stable, tolerable and controlled. "If a symptom can be reasonably controlled by medication or treatment,

it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1996). Moreover, Barnett argues that, although his pain was "stable," it remained at a level of five or six on a 10-point scale, which reasonably would support Dr. Halstead's excessive absenteeism finding due to frequent interferences with attention and concentration. I am not persuaded. First, it is well-settled that the inability to work without some pain or discomfort does not, itself, render a claimant disabled. *See Emmette v. Richardson*, 337 F. Supp. 362, 368 (W.D. Va. 1971); *Scott v. Astrue*, 2009 WL 4841026, at *5 (W.D. Va. Dec. 15, 2009) (citing *Craig*, 76 F.3d at 594-95). Stated differently, a claimant need not be pain-free to be deemed not disabled. Second, the ALJ accounted for Barnett's attention and concentration difficulties by limiting him to work requiring no strict production rates or pace requirements.

Further, the court notes that physical and mental status examinations of Barnett, including those performed by Dr. Halstead, do not support his own limitations. Specifically, Dr. Halstead's examinations yielded completely normal findings, consisting of stable vital signs; clear lungs, bilaterally; normal cardiac findings; full orientation; and a bright affect. When Dr. Halstead completed the physical assessment of Barnett in February 2016, he supported it only by stating Barnett guarded his back and had a slight limp. However, neither observation is contained in any of Dr. Halstead's treatment notes. Likewise, examinations by nurse practitioner Evans do not support Dr. Halstead's opinion. For instance, on April 5, 2016, although Barnett had a slow gait; tenderness of the cervical spine and paraspinal muscles; low back tenderness; left elbow swelling; and diminished sensation in the right upper extremity and both lower extremities, he exhibited normal lung and cardiac findings; normal range of motion of the cervical spine, lumbar spine and left upper extremity; and normal muscle bulk, tone and strength. He also exhibited a flat mood, but had an appropriate affect, appropriate judgment,

good insight and proper orientation. On April 19, 2016, despite left upper extremity swelling, Barnett had a normal range of motion. Mental status examination was the same, except he had a euthymic mood. On May 31, 2016, he had only slight swelling of the left upper extremity with tenderness, but normal range of motion, and mental status examination was, again, completely normal. In April 2017, Barnett was pleasant, cooperative, alert and fully oriented, with normal judgment and insight. He denied anxiety and depression. From May 2017 to March 2018, Barnett denied arthralgias, joint pain, joint swelling, joint stiffness, muscle pain, weakness, back pain, mood disturbance, depression and anxiety. Over this time, Barnett had normal lung, cardiac, motor and sensory examinations; normal muscle bulk, tone and strength; normal gait and tandem walk; no postural instability; full neck range of motion; no clubbing or cyanosis of the extremities; and he was alert and fully oriented; well-groomed; attentive; appropriately responsive; he had a normal ability to communicate; normal mood and affect; intact insight and judgment; a normal general fund of knowledge; intact recent and remote memory, as well as reading and repetition; and fluent and clear speech.

With regard to Barnett's injuries resulting from his chemical exposure in March 2017, a chest x-ray performed the following month showed no acute cardiopulmonary disease. In April 2017, Dr. McNeilly, a pulmonologist, released Barnett to return to work from a pulmonary standpoint. At that time, Barnett reported he continued to smoke cigarettes. In May 2017, Dr. Jones, an allergist, noted a normal examination. In July 2017, Dr. Winstead, an ENT, diagnosed acute sinusitis, headaches and deviated nasal septum, and he recommended Barnett use a steroid spray and nasal saline irrigations. By his next visit, Barnett reported such treatments provided temporary relief. In December 2017, Dr. Pendola, a neurologist, evaluated Barnett's headaches. Examination yielded normal findings, as did an MRI and MRA

of the brain. Nonetheless, in February 2018, Dr. Pendola referred Barnett to a headache specialist. However, the record indicates Barnett was not interested in this referral, as it was too far away. By March 2018, Barnett described his breathing as stable.

Thus, contrary to Barnett's argument, I find the ALJ provided more than sufficient "good reasons" for according "little weight" to Dr. Halstead's opinion, and his weighing of the evidence is supported by substantial evidence. I further find the ALJ's reliance, at least in part, on the 2016 opinion of state agency physician, Dr. Vinh,[9] also is supported by substantial evidence. The ALJ stated that the record, as a whole, supported Dr. Vinh's finding that Barnett could perform light work, but he found Barnett was slightly more limited than Dr. Vinh opined due to chronic headaches and reactive airway dysfunction, resulting from the 2017 chemical exposure. (R. at 28.) Thus, the ALJ included additional limitations in his residual functional capacity finding to account for these impairments – specifically, no more than occasional exposure to temperature extremes, excessive noise, vibrations and pulmonary irritants and no exposure to hazards and unprotected heights. (R. at 23, 28.)

The ALJ's partial reliance on Dr. Vinh's opinion is allowed under the regulations, as it is well-settled that state agency medical consultants are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §§

---

[9] The ALJ gave "reduced weight" to the opinions of the other state agency physician, Dr. Tulou, and state agency psychologist, Insinna, both of whom opined there was insufficient evidence upon which to determine Barnett's claims. (R. at 27, 82-83.) The ALJ found the record as a whole supported a finding that Barnett had severe physical and mental impairments. (R. at 27.) Additionally, the ALJ noted these state agency consultants did not have the benefit of reviewing the treatment notes related to Barnett's 2017 chemical exposure and resulting headaches and breathing impairments. (R. at 27.)

404.1513a(b)(1) 416.913a(b)(1) (2020). Further, the ALJ may rely on findings of nonexamining medical consultants if they are consistent with the record, even if they contradict a treating physician's opinion. *See Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

With regard to Barnett's mental impairments, the ALJ gave "little weight" to the opinion of state agency psychologist McClain that Barnett did not have a severe mental impairment. (R. at 27.) The ALJ stated the record as a whole supported a finding that Barnett had a severe mental impairment, as his treating physician had diagnosed ADHD and anxiety, and Barnett reported some symptoms related to his ADHD, such as inability to focus. (R. at 27.) Thus, the ALJ found McClain's opinion inconsistent with the record. (R. at 27.) Nonetheless, as indicated above, Barnett's mental status examinations consistently demonstrated largely normal findings, he sought neither outpatient nor inpatient mental health treatment, on many occasions, he denied any mental health symptoms, and he testified he stopped taking his ADHD medication. Nonetheless, the ALJ limited Barnett to work requiring no strict production rate or pace requirements.

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found Barnett could perform a limited range of light work – a finding that

is consistent with the evidence of record. Therefore, I find substantial evidence exists to support the ALJ's weighing of the medical evidence and his ultimate residual functional capacity finding.

Barnett also argues the ALJ erred by improperly considering his symptoms. Specifically, he argues the ALJ erred in two ways: (1) by referencing an evaluation of his credibility; and (2) by improperly evaluating the consistency of his allegations with the overall record. However, for the following reasons, I find substantial evidence supports the ALJ's evaluation of Barnett's symptoms. It is well-settled that a claimant's subjective allegations of pain or other symptoms, alone, can never establish disability. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (2020); *see also* Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).[10] The Fourth Circuit, in *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020), recently reiterated the two-step framework for evaluating a claimant's symptoms,[11] such as pain, set forth in 20 C.F.R. §§ 404.1529, 416.929 and S.S.R. 16-3p. First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95; 20 C.F.R. §§ 404.1529(b), 416.929(b) (2020); S.S.R. 16-3p, 2017 WL 5180304, at *3; *see also Craig*, 76 F.3d at 594. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95; 20 C.F.R. §§ 404.1529(c), 416.929(c) (2020); S.S.R. 16-3p, 2017 WL

---

[10] S.S.R. 16-3p, which governs symptom evaluation in disability claims, rescinded and superseded S.S.R. 96-7p, effective March 28, 2016.

[11] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. §§ 404.1502(i), 416.902(i) (2020).

5180304, at *4; *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements regarding the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 592-93.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his medical] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2020). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions

due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

> Here, the ALJ stated as follows in his decision:
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. at 24.) Thus, the ALJ found Barnett satisfied the first, but not the second, prong of the two-part test. As noted by the Commissioner in her brief, the ALJ correctly cited to S.S.R. 16-3p and 20 C.F.R. §§ 404.1529, 416.929 as containing the governing requirements for symptom evaluation. (R. at 23, 26.) However, Barnett argues the ALJ erred by specifically referring to an evaluation of his credibility. Barnett is correct that the purpose of S.S.R. 16-3p was to eliminate the use of the term "credibility," as previously used in S.S.R. 96-7p, because the regulations do not use that term. In particular, S.S.R. 16-3p clarifies that "subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2. Instead, S.S.R. 16-3p states it more closely follows the regulatory language regarding symptom evaluation, which is contained in 20 C.F.R. §§ 404.1529, 416.929. Despite Barnett's argument, in only one sentence in his decision does the ALJ mention "credibility." In particular, the ALJ stated, pertaining to a discussion of Barnett's failure to seek psychiatric care for his mental impairments and that he underwent only conservative treatment for his physical impairments, as follows: "Though not dispositive of the case, such failure is a factor in analyzing the

credibility of claimant's allegations." (R. at 26.) I agree with the Commissioner that such an isolated mention of credibility with regard to the ALJ's evaluation of Barnett's symptoms does not warrant remand, especially when, for the following reasons, his evaluation comports with the appropriate two-step regulatory analysis in all other regards.

In his decision, the ALJ explicitly stated that, in considering Barnett's symptoms, he must follow the two-step process set out above. (R. at 23.) He noted that, when statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, he must consider other evidence in the record to determine if Barnett's symptoms limit his ability to do work-related activities. (R. at 23.) The ALJ then proceeded to set out Barnett's subjective symptoms, including leg numbness, difficulty walking, sitting and standing, shortness of breath and difficulty concentrating. (R. at 23-24.) As stated above, the ALJ concluded the evidence supported a finding that Barnett's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements regarding the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. at 24.) Thereafter, the ALJ embarked on a thorough recitation of the objective medical evidence and an explanation why it did not support Barnett's allegations of symptom intensity, persistence and limiting effects.

As stated by the Commissioner in her brief, this evidence included the same evidence that supports the ALJ's decision to accord Dr. Halstead's opinion little weight, and it will not be repeated here. The ALJ again noted that Barnett's treatment for his allegedly disabling impairments had been essentially routine and

conservative, as well as successful, in controlling his symptoms and that Dr. Halstead's notes consistently indicated Barnett's pain as stable and controlled. (R. at 26.) Likewise, Barnett testified he primarily saw his primary care physician for conservative treatment, and there is nothing in the record to suggest he underwent more aggressive treatment, such as physical therapy or surgical intervention. (R. at 26.) In fact, although Barnett reported in April 2015 that his left rotator cuff injury was pending surgery, there are no treatment notes indicating any such surgical recommendation, nor are there any notes showing Barnett underwent this surgery. At this same visit, Barnett reported he was going on a two-week beach vacation. The ALJ additionally noted that, although Barnett alleged disability due to mental impairments, he neither sought inpatient or outpatient treatment, nor did he consistently complain of mental health symptoms to treating physicians. (R. at 26.) The ALJ also noted Barnett's testimony that he did not take medication for his ADHD. (R. at 26.) Citing to S.S.R. 16-3p, the ALJ explained he considered the type, dosage and effectiveness of the medication and other treatment a claimant used to alleviate symptoms, when evaluating their alleged intensity and persistence. (R. at 25-26.) He further explained a claimant's statements to medical professionals regarding his symptoms, or lack thereof, would be one factor to consider in analyzing the severity of those symptoms and related functional limitations. (R. at 26.) For instance, the ALJ emphasized that a claimant with a disabling impairment typically would consistently complain of and seek treatment for symptoms related to such impairments when seeking medical treatment after the alleged onset date. (R. at 26.) However, Barnett mostly pursued only routine follow-up appointments to obtain medication refills, and he voiced few new complaints. (R. at 26.)

The ALJ also stated that, when a claimant alleges significant mental symptoms, he would expect treating practitioners to note abnormalities on mental

status examinations. (R. at 26.) However, notes from Barnett's treating practitioners typically showed normal mental status findings, except for some routine findings of depressed mood and affect, which would not be expected to cause significant functional limitation. (R. at 26.) Otherwise, Barnett generally exhibited normal insight, judgment and orientation. (R. at 26.)

For all the reasons stated above, I find that the ALJ provided sufficient support for his analysis of Barnett's symptoms, in accordance with S.S.R. 16-3p and 20 C.F.R. §§ 404.1529, 416.929. It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996); *see also Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). For these reasons, I find the ALJ supported his analysis of Barnett's subjective complaints with substantial evidence that Barnett can perform work at the residual functional capacity level as determined by the ALJ.

Based on all the above-stated reasons, I find that substantial evidence exists to support the ALJ's consideration of the medical evidence, his residual functional capacity finding and his evaluation of Barnett's symptoms.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

3. Substantial evidence exists in the record to support the ALJ's evaluation of Barnett's symptoms; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Barnett was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Barnett's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

-35-

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    March 3, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE